**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | | |
|---|---|---|
| **MARSHA TWYMAN,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO: 2:08cv519** |
| | ) | |
| **M. JOHN BERRY, Director,** | ) | |
| **United States Office of Personnel Management,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **UNITED STATES OFFICE OF PERSONNEL** | ) | |
| **MANAGEMENT,** | ) | |
| **Defendants.** | ) | |

**FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**MOTION TO DISMISS COUNT I FOR FAILURE TO PROSECUTE, OR IN THE**
**ALTERNATIVE, FOR SUMMARY JUDGMENT ON COUNT I**

### *Introduction*

Count I of the complaint seeks judicial review of the decision of the Merit Systems

Protection Board (MSPB) affirming the decision of plaintiff's former employer, the Office of

Personnel Management (OPM), to remove plaintiff from her position as an OPM background

investigator for "unacceptable performance." *Compl.* ¶¶ 29-31 (Count I).  In particular, plaintiff

complains that the MSPB erred in finding that OPM's appraisal system was approved by OPM,

and that the performance standards under which she was evaluated were valid. *Compl.* ¶¶ 3, 17.

Count I of the complaint should be dismissed for two reasons.  First, plaintiff has failed

to prosecute her claim that the MSPB erred in that she failed to submit an appropriate brief in

support of her position in accordance with the briefing schedule set forth in this Court's *Joint*

*Rule 16(b) Scheduling Order*, filed August 12, 2009.  Second, even if the Court were to review

the MSPB decision, there is no basis, under the highly deferential standard of review set forth in

5 U.S.C. § 7703(c), to vacate and set aside that decision.  Accordingly, Count I should be

dismissed and the decision of the MSPB upholding the agency's removal of plaintiff affirmed.

*Argument*

## I. Plaintiff has failed to prosecute her claim of error as set forth in Count I.

Plaintiff's lawsuit is a "mixed" case in that it alleges both non-discrimination (Count I)

and discrimination (Count II) claims.  Because it is undisputed that a mixed case is subject to

two different review standards in a district court, *see* Defendants' *Memorandum in Support of*

*Motion to Issue Modified Rule 16(b) Scheduling Order*, pg. 2-3 (filed April 21, 2009); *Compl.* ¶

4, on June 1, 2009, this Court bifurcated consideration of the non-discrimination and

discrimination claims.  *Order*, filed June 1, 2009.  Moreover, consistent with the "record review"

nature of the  proceedings applicable to the non-discrimination claim, *Kelliher v. Veneman*, 313

F.3d 1270, 1274-5 (11th Cir. 2002); 5 U.S.C. § 7703(c), this Court further ordered:

> As to Count I of the complaint, the following briefing schedule has been
> established.  Each plaintiff shall file a motion for summary judgment on or before
> September 15, 2009.  The responses to such motions shall be due on or before
> October 15, 2009.  Any reply shall be filed no later than October 30, 2009.

*Joint Rule 16(b) Scheduling Order* (filed August 12, 2009), ¶ 11.  As of the date of this filing,

plaintiff has not filed a summary judgment motion in accordance with this briefing schedule.

It is plaintiff's burden, with respect to Count I, to establish the MSPB erred when it

upheld the agency's decision to remove her from her federal employment.  *Harris v. Department*

*of Veterans Affairs*, 142 F.3d 1463, 1467 (Fed. Cir. 1998) (plaintiff "bears the burden of

establishing error in the Board's decision" within the meaning of § 7703(c)).  Having failed to

put forth any basis for such purported error in the manner and at the time directed by the Court,

plaintiff has failed to establish error sufficient to warrant this Court setting aside the MSPB's

decision in accordance with § 7703(c).  Accordingly, because plaintiff has failed to appropriately

prosecute this claim, pursuant to Fed. R. Civ. P. 41(b) the decision of the MSPB should be

affirmed and Count I of the complaint dismissed.[1]

**II.      The MSPB's decision upholding plaintiff's removal should be affirmed.**

      **A.      Factual and Procedural Background.[2]**

            1.      *General.*

From approximately February 2005 until her removal on January 31, 2008, plaintiff

Twyman was a GS-12 background investigator with OPM's Field Investigative Services

---

[1] Defendants acknowledge that, generally, sanctions imposed for failure to prosecute are levied in proportion to the severity of the lapses, with dismissal reserved for the most egregious cases.  *Doyle v. Murray*, 938 F.2d 33 (4th Cir. 1991) (setting forth factors to consider).  Should the Court believe some sanction "less drastic than dismissal," *id.* at 34, is appropriate, defendants have separately moved for summary judgment, setting forth the reasons why the decision of the MSPB should be affirmed in accordance with the review standards of § 7703(c).  As an alternative to dismissal, the Court may conduct that review but should preclude plaintiff from offering evidence or argument in response to defendants' motion.

[2] Defendants previously filed an original and electronic version of the administrative record.  The electronic version was Bates paginated (per the Rule 16(b) *Order*) as follows:

| | |
|---|---|
| GARCIA_1 to 338 | MSPB file for Plaintiff Garcia |
| TWYMAN_1 to 471 | MSPB file for Plaintiff Marsha Twyman <u>plus</u> Plaintiff Garcia when cases were consolidated at the administrative level |
| TRANSCRIPT_1 to 279 | Hearing Transcript for consolidated Twyman and Garcia cases |

References in this memorandum to the MSPB record in this memorandum will utilize these page designations.

Division (FISD) in Virginia Beach Virginia.[3]  *Compl.* ¶ 3; TWYMAN_18-21, 79 (Notification of

Personnel Action); TRANSCRIPT_151, 231.  FISD provides background investigative services

to over 100 different federal agencies.  TRANSCRIPT_11.

Prior to 2005, plaintiff had been employed as a background investigator with the

Department of Defense's Defense Security Service (DSS).  TRANSCRIPT_188.  DSS provided

background investigations exclusively for the Department of Defense (DOD).

TRANSCRIPT_9.

In or about 1996, OPM began contracting out its background investigative services to

private contractors, with OPM retaining only oversight responsibility.  TRANSCRIPT_11.  In or

about 2002 or 2003, OPM revisited the privatization question, examining whether OPM and its

federal clients would be better served if OPM had "an in-house investigative capacity."

TRANSCRIPT_12.  Rather than establish a new investigative work force, in February 2005

OPM/FISD absorbed the functions, and workforce, of DOD/DSS.[4]  TRANSCRIPT_11-12.

Plaintiff Twyman, along with the rest of the DSS investigative staff, transferred to OPM/FISD in

or about February 2005.  TRANSCRIPT_151, 181, 231.

2.    *Performance Standards at FISD*.

On September 10, 1986, OPM approved the performance management system for OPM

components, including FISD, which established a five-level rating program for OPM employees

---

[3]  Although based out of the Virginia Beach office, plaintiff, like all investigators, worked out of her home.  TRANSCRIPT_58.

[4]  DSS was struggling financially, suffering from significant backlog in the conduct of their background investigations, and was, according to the testimony before the MSPB, more than willing to transfer these functions to OPM.  TRANSCRIPT_12.

– unacceptable, minimally successful, fully successful, exceeds fully successful and outstanding.
TRANSCRIPT_230; TWYMAN_364 (approval letter).

At or around the time DSS was folded into FISD, FISD's regional managers and deputy
chiefs met to develop the specific performance elements and standards for FISD's background
investigators.  TRANSCRIPT_25, 27.  It was uncontradicted at the MSPB hearing that the
authority to develop and implement such performance elements and standards was expressly
delegated to these supervisory personnel.  TRANSCRIPT_233-34; TWYMAN_382, 405
(delegations).  The performance elements and standards were developed for the purpose of
"establishing accountability and ... meeting [FISD's] institutional goals of providing a quality
product in a timely manner," and were intended to "measure[] the quality, quantity, timeliness,
and professionalism of the work produced."  TRANSCRIPT_17, 25, 27.

As relevant here, the standards included a productivity element which consisted of two
performance metrics: (i) A "sources per day" (SPD) metric, which was a measure of how many
personal interviews or record reviews an investigator completed each day; and, (ii)  a "months of
coverage" (MOC) metric, which was a measure of how much of a span of time in a person's
background an investigator completed per hour.  TRANSCRIPT_24; TWYMAN_91, 98-99.  In
addition, the standards included a timeliness element which evaluated investigators based on
what percentage of their cases had been completed by their "assigned completion date" (ACD).
TWYMAN_91, 98-99.  The standards were the same for all FISD investigators nationwide,
TRANSCRIPT_14, 61, and were developed borrowing from similar metrics used in private

industry as well as at OPM before the background investigative services were privatized in 1996, TRANSCRIPT_32.[5]

    3.      *Plaintiff's Performance and Removal.*

For the period ending September 30, 2006, plaintiff was unable to meet the minimally successful level for productivity and timeliness, a fact plaintiff does not dispute. TWYMAN_103-106; TRANSCRIPT_154, 189.

On February 7, 2007, plaintiff was placed on a Performance Improvement Plan (PIP) for an initial period of 90-days, which was extended until June 30, 2007.  TWYMAN_15, 91-94; TRANSCRIPT_65.  Plaintiff was offered supervisory input during that period in an effort to help her improve, and met (either in person or by telephone) with her immediate supervisor on a weekly basis.  TRANSCRIPT_65-66, 216-217.

As of August 2007, plaintiff's productivity and timeliness had not improved to at least the minimally successful level; accordingly, on August 13, 2007, plaintiff's immediate supervisor, Eric Chilton, proposed that she be removed from federal service.  TWYMAN_14-17. Plaintiff, through her attorney, provided a response.  TWYMAN_18-19.

On January 22, 2008, a Final Removal Decision was issued by Phillip J. Kopman, plaintiff's third line supervisor.  TWYMAN_18-21, 79 (Notification of Personnel Action). Plaintiff's removal was effective January 31, 2008.  TWYMAN_20.

---

    [5] The specific performance metrics at issue here were adjusted downward in 2006. *Compare* TWMYAN_114-17 (2005) *with* TWMYAN_103-10 (2006).  By September 2007, the metrics were removed as "hard and fast" numbers – although they were still used as considerations – to account for regional differences in the difficulty of conducting investigations. TRANSCRIPT_32-33, 40-42.

4.     *Administrative proceedings.*

On February 27, 2008, plaintiff appealed her removal to the MSPB.  TWYMAN_7-12.

On June 4, 2008, plaintiff's case was consolidated for adjudication with plaintiff Pedro Garcia

(Garcia v. Berry *et al*, 2:09cv262), another FISD background investigator who had also been

removed for unacceptable performance.  TWYMAN_264.  On June 19, 2008, a hearing was held

before an Administrative Law Judge (ALJ) on behalf of the MSPB.  TRANSCRIPT_1 to 279.

On August 28, 2008, the MSPB issued its decision upholding and affirming plaintiff's

removal.[6]  GARCIA_298-338.  First, the MSPB found that the agency had met its burden to

prove by substantial evidence (*see* 5 U.S.C. § 7701(c)(1)(A)) that plaintiff's removal for

unacceptable performance was warranted.  GARCIA_303-23.  To that end, the MSPB found that

OPM/FSD took its action under an OPM-approved performance appraisal system

(GARCIA_303-307); that the specific performance standards under which plaintiff was

evaluated were valid (GARCIA_307-20); that plaintiff's performance was deficient

(GARCIA_320-21); and that plaintiff had been provided a reasonable opportunity to

demonstrate acceptable performance (GARCIA_321-26).

Second, the MSPB found that plaintiff had failed to meet her burden to show the

existence of any affirmative defense (*see* 5 U.S.C. § 7701(c)(2)(A) and (B)) to her removal.

GARCIA_323-333.  To that end, the MSPB found that plaintiff had failed to show that she was

the victim of unlawful discrimination (GARCIA_323-31), or that she was the victim of "harmful

---

[6]  The joint MSPB decision is contained in both plaintiff's file at TWYMAN_427-467, and her co-worker Garcia's file.  For simplicity, and since similar pleadings are being filed simultaneously in both cases, the reference to the MSPB decision filed in the Garcia case will be referenced.

procedural error" in that the agency required her to work on personal time in violation of the Fair

Labor Standards Act (FSLA) (GARCIA_331-33).

The ALJ's decision became the final decision of the MSPB on October 1, 2008.

GARCIA_334.  The instant lawsuit followed on October 30, 2008.  In her lawsuit, plaintiff

challenges only the MSPB's finding that the agency acted under an OPM-approved performance

appraisal and that the specific performance standards under which plaintiff was evaluated were

valid.  *Compl.* ¶ 3, 17.

### B.   Standard of Review.

A court's "scope of review of MSPB decisions is defined and limited by" § 7703(c).

*Hayes v. Dep't of the Navy*, 727 F.2d 1525, 1537 (Fed.Cir. 1984); *Veit v. Heckler*, 746 F.2d 508,

509 (9th Cir. 1984) ("[T]he comprehensive remedial nature of the Civil Service Reform Act of

1978 ("CSRA") indicates a congressional intent to preclude ... judicial review except as provided

for in the statute itself.").  This review is limited to whether the MSPB erred (based on the

standards set forth in § 7703(c)) in its decision to uphold the agency-employer's action.

*Hathaway v. Dep't of Justice*, 384 F.3d 1345, 1350 (Fed. Cir. 2004) ("We review the Board's

decision ...."); *Harris v. Department of Veterans Affairs*, 142 F.3d 1463, 1467 (Fed. Cir. 1998)

("We must 'hold unlawful and set aside' any Board decision . . ."); *Cleland v. OPM*, 984 F.2d

1193, 1194 (Fed. Cir. 1993) (This court affirms board decisions unless . . ."); *Hayes*, 727 F.2d at

1537 ("We discharge our own duty when we apply section 7703 to review an MSPB decision

regarding an adverse agency action to determine whether the contested decision complies with

the applicable statute and regulations and whether it has a rational basis supported by substantial

evidence from the record taken as a whole."); *Brewer v. U. S. Postal Service*, 647 F.2d 1093,

1096 (Ct.Cl.,1981) ("In determining whether the Board's decision is supported ....")  Thus, the review does not encompass a *de novo* examination of the underlined employer's action under the standards set forth in § 7703(c), but only determines whether the underlined MSPB's decision upholding that action was erroneous in one of the ways proscribed by § 7703(c).  *Compare* 5 U.S.C. § 7701(c) (standard applied by MSPB in reviewing agency action) *with* 5 U.S.C. § 7703(c) (standard applied on appellate review of MSPB decision).[7]

Plaintiff "bears the burden of establishing error in the Board's decision" within the meaning of § 7703(c).  *Harris*, 142 F.3d at 1467.  Pursuant to § 7703(c), a reviewing court:

> shall review the record and hold unlawful and set aside any agency action, findings or conclusions found to be--
>
>     (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
>     (2) obtained without procedures required by law, rule or regulation having been followed; or
>
>     (3) unsupported by substantial evidence.

5 U.S.C. § 7703(c).

Under § 7703(c)(1)'s "arbitrary and capricious" prong, a reviewing court

> do[es] not substitute [its] judgment for that of the agency but rather only seek[s] to ensure that the decision was reasonable and rational.  . . .  "Along the standard of review continuum, the arbitrary and capricious standard gives an appellate court the least latitude in finding grounds for reversal." . . . We must only

---

[7] As relevant here, underlined at the administrative level the MSPB reviews an employer's action pursuant to the standards set forth in § 7701(c)(1)(A) – a substantial evidence standard – while underlined at the judicial level a reviewing court only reviews the MSPB's decision pursuant to the standards set forth in § 7703(c).  The complaint focuses mostly on why plaintiff believes her employer's decision to remove her was wrong, *e.g.*, *Compl.* ¶¶ 17, 20-26, as opposed to why the MSPB was wrong, and appears to suggest, incorrectly, that the employer's decision should be reviewed pursuant to the § 7703(c) standards, *Compl.* ¶ 30.

"consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment."

*Kelliher*, 313 F.3d at 1276 (internal citations omitted); *Hayes*, 727 F.2d at 1537 (a reviewing court "should not try to place itself in the shoes of the agency and second-guess it").  *See also West Virginia v. Thompson*, 475 F.3d 204, 212 (4th Cir. 2007) (holding similar to *Kelliher* with regard to the same language used in the Administrative Procedures Act, 5 U.S.C. § 706(2)(A), as is used in § 7703(c)(1)); *Blaustein & Reich, Inc. v. Buckles*, 365 F.3d 281, 291(4th Cir. 2004) ("Determining whether an agency action is arbitrary and capricious [under the APA] is subject to a highly deferential standard of review that presumes the validity of the agency action."); *Wilson v. Office of the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS)*, 866 F.Supp. 931, 933 (E.D.Va. 1994) (Clarke, J.) ("The scope of review under the [APA's] 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency.").  As long as there is a "rationale connection between the facts found and the choice made," the decision must be upheld.  *Inova Alexandria Hosp. v. Shalala*, 244 342, 350 (4th Cir. 2001) (APA case).

Under § 7703(c)(2)'s "obtained without procedures required by law" prong, the reviewing court examines whether the MSPB's decision was arrived at in an appropriate manner, that is, whether, in essence, the employee was provided a procedurally fair hearing before the MSPB.[8]  *Kelliher*, 313 F.3d at 1277 (complaint that MSPB decision not issued timely in accordance with regulation); *Framptom v. Dep't of the Interior*, 811 F.2d 1486, 1487-90 (Fed. Cir. 1987) (where MSPB hearing official failed to permit employee to fully present his case and

---

[8]  Beyond expressing disagreement with the outcome, nothing in the complaint describes or alleges any procedural deficiencies in the MSPB hearing process.

all his defenses, employee was denied a fair and impartial hearing and MSPB decision affirming

agency's action had to be vacated and remanded pursuant to § 7703(c)(2)); *Hayes*, 727 F.2d at

1538 (alleging denial of due process where MSPB upheld removal based on evidence of

misconduct occurring on a date different than that stated in the notice of removal, and permitting

hearsay evidence to be introduced at the hearing).  Any claimed error in the conduct of the

MSPB proceeding must be shown by plaintiff to have "prejudiced [the employee's] rights or

affected the outcome of his claims." *Kelliher*, 313 F.3d at 1276

> Under § 7703(c)'s "substantial evidence" prong, a reviewing court
>
> examines the entire record but defers to the agency's factual determinations as
> long as there is relevant evidence that supports the finding as reasonable. ...  This
> deferential standard of review means that as long as the conclusion is reasonable,
> we defer to the agency's findings of fact even if we could have justifiably found
> differently. ...  We do not re-weigh or re-examine the credibility choices made by
> the fact-finder.

*Kelliher*, 313 F.3d at 1276 (internal citations omitted).  *See also Boylan v. United States Postal*

*Service*, 704 F.2d 573, 574-75 (11th Cir. 1983) ("The question is not what the court would

believe on a de novo appraisal, but whether the administrative determination is supported by

substantial evidence on the record as a whole"), *cert. denied*, 466 U.S. 939 (1984); *Brewer v. U.*

*S. Postal Service*, 647 F.2d 1093, 1096 (Ct.Cl.,1981) ("In determining whether the Board's

decision is supported by substantial evidence, the standard is not what the court would believe

on a *de novo* appraisal, but whether the administrative determination is supported by substantial

evidence on the record as a whole.").  "Substantial evidence [under § 7703(c)(3)] is defined as:

'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion.'" *Bradley v. Veterans Admin.*, 900 F.2d 233, 234 (Fed. Cir.

1990) (quoting *Consolidated Edison Co. v. Labor Board*, 305 U.S. 197, 229 (1938)).  Moreover,

where the MSPB's findings are based on credibility determinations, such findings "are virtually unreviewable on appeal." *Bieber v. Dep't of the Army*, 287 F.3d 1358, 1364 (Fed. Cir. 2002).

Finally, even if the MSPB did err, a reviewing court's authority under § 7703(c) only permits it to "hold unlawful and set aside" the MSPB's decision; the district court does not have authority under § 7703(c) to fashion other remedies, much less award damages as plaintiff demands (*see Compl.* ¶ 31). *Brewer v. U.S. Postal Service*, 647 F.2d 1093, 1098-99 (Cl. Ct. 1981). The sole appropriate remedy would be to vacate and remand with, or without, instructions to the MSPB. *Id.*

### C.   Plaintiff's Challenge.

To provide the context for the Court's review, it is important to address the specific issues the MSPB was required to resolve before it could sustain plaintiff's removal, and note what plaintiff has specifically sought to challenge in this lawsuit. First, the agency was required to prove that its decision to remove plaintiff was "supported by substantial evidence." 5 U.S.C.§ 7701(c)(1)(A). To that end, the agency was required to show four things:  (1) that the action was taken under an OPM-approved performance appraisal system; (2) that the agency had valid performance standards which, with the critical elements of the position, were communicated to the employee; (3) that the plaintiff's performance was unacceptable in one or more critical elements; and, (4) that plaintiff was afforded a reasonable opportunity to improve his performance. GARCIA_0301-302 (citing authority); *Compl.* ¶ 16. Before the MSPB, plaintiff did not dispute that her performance was unacceptable, or that she was not provided a reasonable opportunity to improve her performance. GARCIA_302. Accordingly, the only disputed issues were whether the performance appraisal system was OPM-approved, and whether the

performance standards were valid.  *Id.*  As noted *supra*, the MSPB found that the agency had met

its burden on each of these elements.  GARCIA_303-23.

Second, even if the agency had met its burden, the removal would not be sustained if

plaintiff proved an affirmative defense.  5 U.S.C.§ 7701(c)(2).  To that end, and as relevant here,

plaintiff could avoid removal if she proved: (1) that the decision was arrived at through harmful

procedural error; or, (2) that the decision was based on a prohibited personnel practice.  5

U.S.C.§ 7701(c)(2)(A) and (B); GARCIA_0303.  Before the MSPB, plaintiff alleged harmful

procedural error in that the agency was purportedly violating the Fair Labor Standards Act

(FLSA) by requiring employees to work uncompensated overtime.  GARCIA_0331-333.

Plaintiff further alleged that her removal was based on unlawful race discrimination, a prohibited

personnel practice.  GARCIA_0323-331.  As noted *supra*, the MSPB found that plaintiff had

failed to meet her burden to establish either of these affirmative defenses.  GARCIA_323-333.

Accordingly, the removal decision was sustained.

In the complaint, plaintiff challenged <u>only</u> the MSPB's finding that the performance

appraisal system was OPM-approved, and that the agency's performance standards were valid.

*Compl.* ¶ 3, 17.  Plaintiff did not challenge the MSPB's finding that her performance was

unacceptable or that she was provided a reasonable opportunity to improve, nor did she

challenge the findings that she failed to establish either of her affirmative defenses.[9]  A party is

generally bound by his pleadings.  *Bender v. Suburban Hosp., Inc.*, 159 F.3d 186, 192 (4th Cir.

1998); *Lucas v. Burnley*, 879 F.2d 1240, 1242 (4th Cir.1989).  Accordingly, the Court's review

---

[9]  Plaintiff separately filed his discrimination claim, which he is permitted to do.  5
U.S.C. §§ 7703(b)(1) and 7703(b)(2); 5 C.F.R. § 1201.157; 29 C.F.R. § 1614.310(b).

of the MSPB decision should be limited to whether the MSPB erred in finding that the performance appraisal system was OPM-approved, and the agency's performance standards were valid.[10]

**D.      The MSPB did not err in finding that plaintiff's removal was taken under an OPM-approved performance appraisal system**.

The MSPB found that the agency produced substantial evidence to establish plaintiff's removal was taken under an OPM-approved performance appraisal system. GARCIA_303-307. This finding was both a reasonable conclusion based on the evidence presented, and does not reflect clear error. 5 U.S.C. § 7703(c)(1) and (3); *Kelliher*, 313 F.3d at 1276.

The evidence before the MSPB included a letter from OPM's Acting Assistant Director stating that the relevant performance system was approved, TWYMAN_364 (approval letter), as well as testimony from an OPM human relations specialist regarding that approval, TRANSCRIPT_230. This constitutes "substantial evidence" on this issue.

> Substantial evidence of OPM approval of an agency's performance appraisal system may consist of documentary and/or testimonial evidence. ... Such evidence may be presented expeditiously in various forms, such as a letter from OPM stating its approval or an affidavit to that effect by an agency official with knowledge of the approval. ... Of course, a showing of OPM approval may also be made by, inter alia, the direct hearing testimony of an agency official with knowledge of the approval.

*Griffin v. Department of Army*, 23 M.S.P.R. 657, 663 (1984); *Satlin v. Department of Veterans Affairs*, 60 M.S.P.R. 218, 222 (1993) (copies of OPM's approval letter stating that "OPM had

---

[10]   In any event, insofar as, before the MSPB, plaintiff did "not dispute that [she] failed to meet the agency's standards as set forth in the critical elements at issue," and "concede[d] that the agency provided [her] with a reasonable opportunity to demonstrate acceptable performance," GARCIA_302, 320-323, the MSPB's findings on those points could never be unreasonable or clear error.

approved the agency's performance management system plan ... satisfied [the agency's] burden of showing affirmatively, by substantial evidence, that it had received OPM approval before undertaking this personnel action.").

Plaintiff argued before the MSPB that this evidence was not sufficient because the specific performance elements and standards – distinct from the appraisal system at large – under which she was evaluated (and which led to her removal), had not been expressly approved by OPM.  GARCIA_305-306.  However, controlling authority is clear:  OPM approval is <u>not required</u> of specific critical elements or performance standards.  *Adamsen v. Dep't of Agriculture*, 571 F.3d 1363 (Fed. Cir. 2009) ("[W]e did not intend even to suggest that OPM approval of employees' performance standards would be required. It is not."); *Lovshin v. Department of Navy*, 767 F.2d 826, 833 (Fed. Cir. 1985) ("OPM approval of an agency's performance appraisal system is required (§ 4304(b)(1)).  However, it is important to know that 'such approval does not involve OPM review of the performance elements and standards established for each position.'"); *Whitney v. Dep't of the Treasury*, 28 M.S.P.R. 330, 333 (1995) ("There is no statutory or regulatory requirement that OPM review the appraisal plan of the agency's subcomponents or review the specific critical elements or performance standards thereof."); *Satlin v. Department of Veterans Affairs*, 60 M.S.P.R. 218, 222 (1993) ("It is not required that the agency establish that specific critical elements or performance standards were submitted to OPM in order to establish valid OPM approval under Chapter 43.").  Moreover, the uncontradicted evidence before the MSPB included documentary, TWYMAN_382, 405 (delegations), and testimonial, TRANSCRIPT_233-34, evidence that the authority to establish and approve specific performance elements and standards for each position had been

appropriately delegated to supervisory personnel, and that those elements and standards had, in

fact, been appropriately developed by FISD's regional managers and deputy chiefs,

TRANSCRIPT_25, 27.

Accordingly, the MSPB's finding that the agency had met its burden of proof to show

plaintiff's removal was taken under an OPM-approved performance appraisal system,

GARCIA_304-305, and that plaintiff's specific performance elements and standards were

appropriately developed at the supervisory – not OPM – level, GARCIA_305-307, was clearly

reasonable and not clear error.

   E.    **The MSPB did not err in finding that the performance standards under**
         **which she was evaluated were valid.**

The MSPB found that the agency had produced substantial evidence to establish the

performance standards under which plaintiff was evaluated were valid.  GARCIA_307-320.

This finding was both a reasonable conclusion based on the evidence presented, and does not

reflect clear error.  5 U.S.C. § 7703(c)(1) and (3); *Kelliher*, 313 F.3d at 1276.

Performance standards are valid if they comport with 5 U.S.C. § 4302(b)(1), in that the

elements and standards "to the maximum extent feasible, permit the accurate evaluation of job

performance on the basis of objective criteria ... related to the job in question."  5 U.S.C. §

4302(b)(1); *Rogers v. Department of Defense Dependents Schools*, 814 F.2d 1549, 1553 (Fed.

Cir. 1987).[11]

―――――――――――――

[11]  Section 4302 was enacted as part of the Civil Service Reform Act of 1978, Pub.LNo.
95-454, 92 Stat. 1157.  *See Wilson v. Department of Health and Human Services*, 770 F.2d 1048,
1054 (Fed. Cir. 1985) (discussing history).  The purpose behind the amendments were to
eliminate a system that was too subjective and, quite simply, made it difficult to remove non-
performing employees.  *Id.*, at 1051 ("Congress intended the Reform Act to initiate and continue
a system that would assure that competent employees would be retained and unsatisfactory

> [U]nder the statute's objectivity requirement performance standards must be reasonable, sufficient in the circumstances to permit accurate measurements of the employee's performance, and adequate to inform the employees of what is necessary to achieve a satisfactory or acceptable rating.  If the performance standards satisfy this test, then they further the congressional purpose.

*Wilson v. Department of Health and Human Services*, 770 F.2d 1048, 1052 (Fed. Cir. 1985).

The test is not whether plaintiff or the Court could envision a better way to evaluate employees or inform them of what was required to achieve satisfactory performance.  *Id.*, at 1056 n.6 ("It does not destroy the standard that some EPA employees ... could have drawn up even a more precise a standard.  Congress did not mandate the most exact standard conceivable.")   Agencies are entitled to "'great flexibility to choose or develop their own systems.  Agencies should determine what type of performance appraisal methods best suited there needs.'"  *Id.*, at 1054 (quoting legislative history).  Thus, standards are valid as long as they are "sufficiently objective and precise in the sense that most people will understand what they mean and what they require."  *Id.*, at 1055.  Moreover, when evaluating whether an employee was adequately informed of what is required to achieve satisfactory performance, the MSPB was entitled to take into account whether elements and standards were "fleshed out" in other information provided to the employee, including in performance improvement plans (PIPs).  *Id.*, at 1052.

      1.     *The performance elements permit the accurate evaluation of job performance on the basis of objective criteria.*

Plaintiff was removed for failing to meet the critical elements of productivity and timeliness.  TWYMAN_14-17 (proposed removal); 18-21 (removal decision).  It is not subject to

---

employees removed.")

any genuine dispute that the performance metrics for these elements are "sufficiently objective and precise," *Wilson*, 770 F.2d at 1055, such that they "permit the accurate evaluation of job performance on the basis of objective criteria." 5 U.S.C. § 4302(b)(1).

The productivity element consisted of two performance metrics: (i) A "sources per day" (SPD) metric; and, (ii) a "months of coverage" (MOC) metric. TRANSCRIPT_24; TWYMAN_91, 98-99. The "sources per day" (SPD) metric was a precise measure of how many persons were interviewed or records reviewed by an investigator during each day. TRANSCRIPT_24; TWYMAN_91, 99. For example, if, during the course of a day, an investigator interviewed two individuals, and reviewed three documents, his or her SPD for that day would be "5." To meet the minimally successful level, plaintiff was required to achieve a SPD of 3.5. *Id.*; TWYMAN_91, 98-99.

The "months of coverage" (MOC) metric was a weighting mechanism used to "try to establish the relative degree of effort" any particular case would take to investigate. TRANSCRIPT_24. The longer the time-period an investigator had to cover regarding a subject, the more potentially involved the investigation, and, therefore, the greater its assigned MOC. *Id.* For example, if a subject had worked at a company for three years, that would correlate to a MOC of 36 months, while a seven year stint would correlate to an MOC of 84 months. *Id.* To meet the minimally successful level, plaintiff was required to have a MOC of 3.5 per hour. *Id.*; TWYMAN_91, 99.

The timeliness element was a measure of the "timeliness in completing [assigned] investigations," TWYMAN_91, and was based on the percentage of the investigator's cases that were completed on or before the "assigned completion date" (ACD). TWYMAN_116 ("The

Assigned Completion Date (ACD) is defined as the expected date that all items of a case assigned to an agent will be completed.")  To meet the minimally successful level, plaintiff was required to have an ACD of 85%.  TWYMAN_91, 98.

In sum, the foregoing standards, are measures of specific action and conduct of an investigator in the course of performing his or her job:  how many information sources (people or documents) did you contact; how much of a subject's history did you cover in a day; and how many of your cases are completed by the date they are supposed to be completed.  Though plaintiff believes the level at which the standards are pegged is unattainable (which is disputed), it cannot be denied that they are "objective and precise in the sense that most people will understand what they mean."  *Wilson*, 770 F.2d at 1055.  The MSPB found that these standards "permit the accurate evaluation of job performance on the basis of objective criteria and ... provide a benchmark toward which [plaintiff] could direct [her] performance."  GARCIA_318-19.  This finding was both a reasonable conclusion based on the evidence presented, and does not reflect clear error.  5 U.S.C. § 7703(c)(1) and (3); *Kelliher*, 313 F.3d at 1276.

> 2.   *The performance standards for productivity and timeliness are a reasonable means by which to measure plaintiff's performance.*

As the MSPB noted, plaintiff's primary argument on the validity of the performance standards was that "the standard[s] were unattainable without working additional uncompensated hours."  GARCIA_309.  The MSPB found that there was "sufficient evidence to conclude that the standards could be met within the regular 40 hour work week."  GARCIA_319.

As noted *supra*, agencies are afforded "'great flexibility'" in developing and choosing the manner in which their employees should be evaluated so as to meet the needs and objectives of the agency.  *Wilson*, 770 F.2d at 1054.   As the MSPB has held:

> The managers of federal agencies, not the members of the Board, have the
> authority to decide what agency employees must do in order to perform
> acceptably in their particular position. .... [U]nder a plain language interpretation
> of section 4302(b)(1), an agency is free to set its performance standards as high as
> it thinks appropriate, so long as those standards are objective and meet the other
> express requirements of section 4302(b)(1).

*Jackson v. Department of Veterans Affairs*, 97 M.S.P.R. 13, 18-19 (2004).  *See also Guillebeau*

*v. Department of the Navy*, 362 F.3d 1329 (Fed. Cir. 2004) (absolute performance standards not

barred by § 4302(b), nor are they per se unreasonable).

The MSPB heard testimony that puts the development of the elements and standards at

issue here in the appropriate context.  Prior to the transfer of the background investigative

functions from DSS to FISD, DSS struggled to complete its investigative duties and

responsibilities effectively, timely, and within budget.  TRANSCRIPT_12, 15.  There were

significant backlogs in background investigations, with large numbers of cases still pending after

two years.  TRANSCRIPT_12, 16, 19.  "The prevailing environment prior to the transfer was

one in which there was no accountability," TRANSCRIPT_16, and with "no performance

standards to measure the efficiency and effectiveness of the workforce," TRANSCRIPT_14, 151.

To that end, plaintiff acknowledged that performance standards at DSS were more subjective,

and were not consistent.  TRANSCRIPT_192, 213-214 (standards went "backwards and

forwards," changing often).

Faced with this challenge, "[o]ne of the first things that the [FISD] management team did

in February of 2005 was to gather ... and try to put together our building blocks for the program

going forward."  TRANSCRIPT_25.  This team included OPM's regional managers and their

deputies, each of whom had "expansive, extensive, in-depth experience in this business.

Approximately five of those members were from the Defense Security Service, and three of us

were from OPM/private sector."  TRANSCRIPT_26.  The needs and objectives of the agency, as understood by this management team, were plain: "establish[] the capacity to complete the work to our customers in a timely, good quality, cost effective manner ... [and] meet[] our institutional goals of providing a quality product in a timely manner."  TRANSCRIPT_27.  This objective was accomplished by establishing "performance standards which measured the quality, quantity, timeliness, and professionalism of the work produced."  TRANSCRIPT_17.  The MSPB heard undisputed testimony that the specific performance metrics developed here borrowed heavily from similar metrics already used in private industry as well as at OPM before the background investigative services were privatized in 1996.  TRANSCRIPT_32.  The standards were the same for all FISD investigators nationwide.  TRANSCRIPT_14, 61.

These standards, however, constituted a "[d]ramatic cultural change[] ... in the way we did work," and in particular, "the establishment of accountability" for investigators as compared to how things had been at DSS.  TRANSCRIPT_15.  DSS investigators had been effectively distanced from real responsibility over cases; rather than personally managing how the investigation would be conducted and having responsibility for the outcome, investigators were assigned discrete and specific tasks by "scopers" who would "lay out where to go and what to do."  TRANSCRIPT_16-18.  In contrast, at FISD "scopers" were eliminated, and "there was a significant change ... in the level of responsibility placed on the agent for the efficient and effective management of their workload."  TRANSCRIPT_17.  Caseloads were reduced, but agents were then individually "expected to ensure a high degree of efficiency ... to organize, zone, plan their work day to be as efficient as possible."  TRANSCRIPT_18.

This newly developed "establishment of accountability" and responsibility, TRANSCRIPT_15, met investigators, like plaintiff, transferring from DSS to FISD in early 2005. As might be expected (given the history at DSS), not all adjusted well, TRANSCRIPT_28 (there are good people "who really don't possess the skill set to do this job. That's it."), and for some, "just the whole idea of having to meet a performance standard or performance metric and being rewarded, or having action taken when you failed to do that, ... was very, very threatening," *id.* But the mere fact that some, including plaintiff, could not adjust does not render the standards unattainable and, therefore, objectively unreasonable and invalid.

Although the MSPB heard testimony that some agents *complained* about having to work "off-the-clock" to meet the performance standards, it found that the evidence was insufficient to show that it was not possible to comply with the standards during the regular work week. TRANSCRIPT_316-17. First, it was undisputed that investigators work "completely independently of each other," TRANSCRIPT_58, and many of the investigators who testified acknowledged that they were in no position whatsoever to evaluate the work habits or efficiency of fellow investigators. *E.g.* TRANSCRIPT_93 (Krack); 101 (Fisher); 119 (Karsen) Second, of the seven employees who testified (other than plaintiff and her co-plaintiff, Garcia), four stated that they personally did not work off-the-clock to meet the performance standards. TRANSCRIPT_107 (Karsen); 123 (Wright); 238 (Parker); 255 (Moore).[12] One other testified

---

[12] One of these employees (Moore) described some occasional de minimus off-the-clock administrative work, checking emails at the end of the day or printing off a map for the next day's travels, but did not testify that it was not possible to meet performance objectives working a regular workweek. TRANSCRIPT_256-57 (Moore). Moreover, investigators worked out of their homes, TRANSCRIPT_58, and as another employee noted, "working at home and handling your work within 20 feet of where you live at, you had a tendency to gravitate, to review cases," TRANSCRIPT_80 (Cupper).

that, although she worked off the clock, she was "not certain" whether that was necessary to meet the performance standards.  TRANSCRIPT_102 (Fisher).  Third, of the remaining two employees who testified that they worked off-the-clock, one could not be specific as to what amount of time he worked off-the-clock, "maybe an hour here and an hour there," but that he stopped working off-the-clock in May 2006, and never received an unfavorable rating.  TRANSCRIPT_80-81 (Cupper).  Moreover, he acknowledged he had a "conflict" with his supervisor (a different supervisor than plaintiff's) who questioned his efficiency in the area of production (the same area plaintiff struggled in).  TRANSCRIPT_79 (Cupper).  The other stated that, while he worked off-the-clock, he "didn't do a lot of it."  TRANSCRIPT_87, 91 (Krack).  Moreover, he testified that "off-the-clock" to him meant going "beyond your eight hours," although he acknowledged that he also used "flex time, TRANSCRIPT_93, which, almost by definition, would encompass working "beyond ... eight hours."  *See* TRANSCRIPT_238-29 (describing a flex schedule).  Finally, a former supervisor testified he was unaware of investigators working on their own time, explaining that they were responsible for "adjust[ing] their time" (i.e., using a flex schedule) if they had to work an odd hour.[13]  TRANSCRIPT_142 (Burnette).

Moreover, the MSPB also heard that the overwhelming majority (about 98%) of the approximately 400 employees within plaintiff's region and working under the deciding official were able to achieve "at least a minimally successful level of performance," TRANSCRIPT_23, 42; approximately one-third of the region's investigative staff were recognized at the "exceeds or

---

[13]  For her part, plaintiff conceded that she was unable to meet the standards whether or not she worked off-the-clock (although she was unable to specify what amount of off-the-clock work she actually engaged in).  TRANSCRIPT_190, 201-02.

outstanding" performance level, TRANSCRIPT_20; and almost half of plaintiff's immediate co-workers under her first line supervisor received performance awards.  TRANSCRIPT_60.  The testimony before the MSPB was also undisputed that the new standards effectively furthered the underlying goals and objectives of the agency at transition:  The turn-around time in typical cases was reduced to less than 90 days from "hundreds of days ... in the DSS era," and the number of cases completed past deadlines was reduced to approximately 6% of the overall work.  TRANSCRIPT_19.  The MSPB was entitled to weigh this evidence and find that the claims made by some witnesses that others had complained about working on overtime were not credible.  Such findings "are virtually unreviewable on appeal."  *Bieber*, 287 F.3d at 1364.

   3.   *Plaintiff was fully informed of what was required to achieve satisfactory performance.*

Lastly, it is beyond any dispute that plaintiff was adequately "inform[ed] ... of what [was] necessary to achieve a satisfactory or acceptable rating" for the productivity and timeliness elements.  *Wilson*, 770 F.2d at 1052.  The specific elements and performance metrics were expressly communicated to her by a former supervisor on November 9, 2005.  TWMYAN_114-17.  She was notified on April 24, 2006, that her performance was "below the Fully Successful level."  TWMYAN_113.  She was advised again of the standards on May 26, 2006, TWMYAN_103, and notified on November 3, 2006 (in a performance evaluation) why her performance, as measured against those standards, was unacceptable.  TWMYAN_103-10.  Plaintiff's response to that evaluation clearly reflects her understanding of the performance elements.  TWMYAN_111.  On February 7, 2007, plaintiff was placed on a PIP, which provided significant detail how plaintiff could improve her performance (i.e., the details were "fleshed out," *Wilson*, 770 F.2d at 1052).  TWMYAN_91-94.  On April 10, 2007, plaintiff was again

advised of the standards during a progress review and that her performance continued to be

unacceptable in the productivity and timeliness elements.  TWMYAN_96-101.  Lastly, and as

documented by numerous emails and memorandum provided to plaintiff following supervisor

"ride-alongs," plaintiff met and communicated regularly with her supervisor during the PIP

(November, 2006 to April, 2007), in an effort to raise her performance to the minimally

successful level.  TWMYAN_143-172; TRANSCRIPT_65-66.

     The MSPB found that the performance standards "provided a benchmark toward which

[plaintiff] could direct [her] performance," GARCIA_318-19, and that plaintiff was fully

informed of these standards.  GARCIA_321.  Moreover, the MSPB noted that, at no time did

plaintiff claim she "was unaware of [her] performance standards or that [she was] not provided

with an ample amount of time to demonstrate successful performance."  GARCIA_322.  These

findings were both reasonable conclusions based on the evidence presented, and do not reflect

clear error.  5 U.S.C. § 7703(c)(1) and (3); *Kelliher*, 313 F.3d at 1276.

### *Conclusion*

     For the reasons stated herein, Count I should be dismissed and the decision of the MSPB

upholding the agency's removal of plaintiff affirmed.

                        Respectfully submitted,

                        M. JOHN BERRY, Director
                        United States Office of Personnel Management

                        UNITED STATES OFFICE OF PERSONNEL
                        MANAGEMENT
                        Defendants

                        NEIL H. MACBRIDE
                        United States Attorney

By: _____//s//_____
Kent P. Porter
Assistant United States Attorney
Virginia State Bar No. 22853
Attorney for Federal Defendants
8000 World Trade Center
101 West Main Street
Norfolk, Virginia 23510
Phone: 757.441.6331
FAX: 757.441.6689
EMAIL: Kent.Porter@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that, on the 8th day of October, 2009, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of electronic filing (NEF) to the following filing user(s):

James H. Shoemaker, Jr., VSB #33148
Veronica Meade-Sheppard , VSB #66727
Patten, Wornom, Hatten & Diamonstein, LLC
12350 Jefferson Avenue, Suite 300
Newport News, Virginia 23602
Phone: 757.223-4580
FAX: 757.223-4518
EMAIL: jshoemaker@pwhd.com
        vsheppard@pwhd.com

_____/s/_____
Kent P. Porter
Assistant United States Attorney
Virginia State Bar No. 22853
Attorney for Federal Defendants
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, VA  23510
757- 441-6331 Office
757-441-6689   Fax
Kent.Porter@usdoj.gov