IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

MARSHA TWYMAN

    Plaintiff

v.

M. JOHN BERRY,

                                 Civil Action No. 2:08cv519

and

UNITED STATES OFFICE OF
PERSONNEL MANAGEMENT

    Defendants.


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF TWYMAN'S MOTION
FOR PARTIAL SUMMARY JUDGMENT AND IN OPPOSITION TO
THE FEDERAL DEFENDANTS' MOTION TO DISMISS COUNT I
FOR FAILURE TO PROSECUTE, OR IN THE ALTERNATIVE,
FOR SUMMARY JUDGMENT ON COUNT I**

The Plaintiff, Marsha Twyman, by counsel, states as follows:

### I.    Preliminary Statement

Count I of Twyman's Complaint asserts that the Agency's firing of her was unlawful under 5 U.S.C. § 7701(c)(1)(A) because: 1) the performance appraisal system under which she was found deficient was never approved by OPM, and 2) the Agency's performance standards used to terminate her were invalid.

The complete administrative trial record of this case makes it clear that nearly all investigators in Twyman's position had to work "off the clock" on their own personal time in order to meet the performance quotas. The full extent of the "off the clock" work was known to Agency management. The performance appraisal system therefore violated the Fair Labor

Standards Act, 29 U.S.C. § 216, et seq. as well as the government's regulations implementing the Act. It is critical to note that the Agency itself recognized the invalidity of this system in late September, 2007, and abolished it approximately one month before Twyman was fired for failing to meet it. This performance appraisal system was never approved by OPM as required by statute.

## II.     Response to the Federal Defendants' Argument that Plaintiff has Failed to Prosecute

Twyman's failure to file a Motion for Summary Judgment and supporting brief on September 15, 2009, as required by the Scheduling Order, was the fault of undersigned counsel and the result of his failure to comprehend that the deadline mandated a filing. This was entirely the fault of the undersigned counsel as opposed to assistants, paralegals or associates. It was, however, a mistake of comprehension as opposed to accidental delay, purposeful delay or dilatory conduct.

Though there is no excuse for the mistake, the following is offered in mitigation of it. It appears that the nature of the deadline, as well as its insertion into the Scheduling Order, was discussed at the Scheduling Conference. The undersigned counsel was unavailable to attend the Scheduling Conference and sent an associate, relatively inexperienced in these matters, in his place. The associate made no particular note of the deadline to the undersigned assuming, correctly, that the order would promptly issue. This is the first case in which the undersigned counsel has challenged a ruling of the Merit Systems Protection Board in U.S. District Court. Typical scheduling orders might sometimes have an optional plaintiff's deadline for filing a motion for summary judgment, but this is the first time counsel has had a mandatory deadline for filing such a motion.

The trial is set for March of 2010. There would be absolutely no prejudice to the Federal Defendants by allowing the late filing of Twyman's motion for partial summary judgment and supporting brief. Finally, the Plaintiffs and their counsel have expended significant time, fees and costs on this case. In consideration of the expenditure of resources that has already taken place in the administrative trial, coupled with the merits of the case and lack of prejudice to Defendants, fairness considerations militate strongly in favor of allowing Twyman to file her motion for summary judgment and to prosecute her claim set forth in Count I of the Complaint.

### III. Listing of Undisputed Facts and Facts Established in the Administrative Record

1. Twyman worked as an Investigator GS-1810-12[1], Field Investigative Services Division/Southern Region ("FISD/SR"), Office of Personnel Management based in Virginia Beach, Virginia at the time of her termination from OPM. *See* Initial Decision of Administrator, Judge Sherry A. Zamora, p.2; Trial Transcript ("T.T.") at 150.

2. At the time of his termination, Twyman had worked in the same capacity as a Federal Investigator for approximately 22 years. T.T. at 151.

3. The investigator position involved performing background investigations on candidates for secret and top-secret security clearances from the United States government. T.T. at 152-153.

4. Investigators were non-exempt employees under the Fair Labor Standards Act. As a result, OPM could not "suffer" them to work in excess of 40 hours per week without paying them overtime compensation at 50% above their regular rate of pay. T.T. at 27.

---

[1] The phrase "investigator" in this brief shall refer to OPM FISD/SR security background investigators holding similarly situated positions to Twyman and generally holding the designated series GS-1810.

3

5. The typical investigator would begin his investigation with a file of information derived primarily from the candidate's security clearance application and any existing governmental files. T.T. 152-157; Administrative Judge Zamora Initial Decision, pp. 12-23. The investigator would then assess the numbers of existing sources of information. *Id*. These sources could be individuals or documentary records. *Id*. The investigator was responsible for gaining access to and questioning or examining the sources to obtain relevant information as to the candidate's fitness for the security clearance. *Id*.

6. Prior to 2005, the investigative function performed by OPM FISD/SR was performed by the Defense Security Service ("DSS"), an agency within the Department of Defense. OPM's need for security background investigations for non-defense agencies of the United States was met by private contractors prior to 2005. T.T. at 9-10.

7. OPM had never employed investigators prior to DSS becoming part of OPM in 2005, and, prior to that time, did not have a performance appraisal system in place for this class of employee. T.T. at 13, 24, 36, 54-55.

8. In 2005, OPM hired Philip Kopman to run FISD/SR. Since approximately 1996, Kopman had worked for U.S. Investigative Services ("USIS"), one of the private contractors performing background investigation services for OPM. T.T. at 13, 24.

9. Kopman testified at Twyman's administrative trial that he was charged with creating the performance appraisal system for OPM FISD/SR and that the performance standards at USIS were "our starting point." T.T. at 24. In other words, the standards came from a private sector employer. *Id.*

10. Kopman instituted a system pursuant to which each investigator was required to examine and assess 3.5 sources per day ("SPD") and 3.5 months of coverage per hour ("MOC").

In addition, investigators were required to meet their assigned completion date ("ACD") on each subject 85% of the time. *See* Initial Decision of Administrative Judge Sherry A. Zamora at pp. 10-11.

11.     MOC was a metric intended to assess the span of time of the candidate's life history evaluated per hour of investigation time while SPD simply measured the number of sources examined and assessed per day. *Id.*

12.     Working "on the clock" overtime, while allowed, would not aid an employee in meeting SPD and MOC targets because recorded official time only increased the quotas required at a level commensurate with the actual hours worked. T.T. at 110-111.

13.     The performance appraisal system introduced by Kopman in 2005 was never reviewed by OPM to determine compliance with 5 U.S.C. § 4301, et seq. T.T. at 24, 36-37, 228-231. The Agency cites two facts in support of its argument that the performance appraisal system was approved by OPM:  1) a 1986 letter (written 19 years before Kopman introduced the appraisal system) that addresses something called a "performance management system" and 2) the testimony of an HR specialist, Donna Ifft, who stated that Kopman himself was empowered to approve "performance management systems." T.T. at 36-37, 227, 234. If the second element is true, Kopman testified that he did not know whether the system was approved or not. T.T. at 37-37.

14.     The relevant statutory provision requires that OPM approve the "performance appraisal system" sometimes referred to in this statute and annotations as "performance appraisal plan." Judge Zamora picked up on this in the questioning of Donna Ifft, a human resources specialist:

| | |
|---|---|
| Administrative Judge Zamora: | Ma'am, can you just explain the difference between the performance management system plan and a performance appraisal system? They're different, are they not? |
| Ifft: | Yes, they are. |
| Administrative Judge Zamora: | Okay. I think there is some confusion about that. Can you explain that, please? |
| Ifft: | I'm actually not expert in that area. |

T.T. at 231-232. In other words, the only thing that the government's witness could confirm was that the statutory "performance appraisal system" and the "performance management system" she spoke of were two different things. *Id.*

15. The Agency, in some apparent desperation, attempted to prove that OPM had approved the "performance management system" through local supervisors. Ifft stated that power was delegated to approve these systems and that, essentially, Kopman must have done so. T.T. 227-232. When asked about this subject in the administrative trial, Kopman testified as follows:

| | |
|---|---|
| Q. | Now, Mr. Kopman, that performance appraisal system was never approved by OPM and reviewed by OPM to ensure compliance with Title 5, Chapter 43 of the U.S. Code, was it? |
| A. | I have no idea what that section of the Code states. But counsel, since we did our deposition last week, counsel has told me that our standards were approved by OPM. |

T.T. at 36-37.

16. Administrative trial testimony was undisputed that FISD/SR supervisors could and did assign easier investigation subjects to favored employees. Compare, T.T. at 134, 240-241 with 168-173, 192-194. "Easier" investigation subjects were those security candidates for

6

whom it was easy to amass SPD and MOC credits. *Id.* To give an example, if several investigation subjects and/or sources related to a subject were given to an investigator at one location of the Joint Forces Command, it would be far easier to meet SPD and MOC quotas for a particular day than if subjects/sources were scattered across Hampton Roads at Dam Neck, Fort Eustis, Naval Station Norfolk, etc. Moreover, meeting SPD and MOC requirements if the subjects and/or sources were located with mobile military units such as ships was far more difficult than if they were assigned to stationary commands. *Id.*

17. Twyman was frequently assigned subjects/sources in a single day that spanned across Hampton Roads or, sometimes, were on a ship. *Id.* Favored investigators were not. *Id.*

18. It is uncontradicted in the administrative trial record that a significant majority of investigators who worked in Virginia had to work on their own time (i.e., uncompensated time) in order to meet the SPD and MOC production quotas. T.T. at 73-74 (testimony of Agent Bill Cupper); 85-86 (testimony of Agent Fred Krack); 87, 95, 96-97 (testimony of Agent Sandra Fisher); 106-113 (testimony of Agent Melanie Karsen); 122-123, 125-126 (testimony of Kelly Wright); 173-174 (testimony of Agent Pedro Garcia); and 188-189, 192-193 (testimony of Agent Marsha Twyman). Nearly all of these witnesses also testified that approved overtime could not help meet the quotas because it only increased them. *Id.*

19. The government attempted to rebut the testimony cited in paragraph 18, above, and meet their own affirmative burden of proof that the appraisal system was valid with only two investigator witnesses. Their effort not only failed, it actually advanced Plaintiff's case. Mary Parker was an investigator called by the government who testified that while she never personally worked "off the clock" in order to meet SPD and MOC quotas, on cross examination she admitted attending a meeting of her colleagues in June of 2006, with Kopman, at which the

"consensus" of her colleagues was that one had to work substantial private time to meet the SPD and MOC quotas. T.T. at 242. Deborah Moore was an investigator called by the government who testified that a "majority" of her colleagues claimed that the quotas could not be met without working off the clock. T.T. at 258. On direct she claimed that she did not personally work off the clock. On cross she admitted working at least 3 to 4 hours per month "off the clock." T.T. at 257.

20. The egregious extent of the "off the clock" requirement is patent in the extant record. One particularly credible witness was Sandra Fisher. She testified that she spent virtually the same amount of time working "off the clock" as she did on the clock. She further testified that most of the employees had to work on their own time to meet the quotas and that, essentially, working on personal time was the only way to do it. T.T. at 96-97.

21. There are elements of Judge Zamora's opinion that ignore or erroneously represent the clear facts of the case. For instance, Judge Zamora states in her opinion: "Ms. Fisher testified that she chooses to work on her personal time to meet the performance metrics. She specifically stated that it is not required but that she has worked 40-50% extra time on her own since OPM assumed the investigative function." Judge Zamora went on to say: "The witness stated that she told Mr. Chilton she was working extra time but he told her that she should report it as overtime and be paid for it. Nonetheless, the witness indicated that she chose not to do that because she 'wanted to stay ahead of the game as far as the work was concerned' and that was *[her] way of doing it*." (Emphasis added.) Here is the way the record actually reads:

> Q: Okay. Have you ever worked on personal time in order to meet those metrics?
>
> A. Yes, I have.

> Q. Okay. How often have you had to do that?
>
> A. Well, I've never had to do it. I choose to do it.
>
> Q. Okay. How often do you do it?
>
> A. Out of a month's time, probably 40-50% of the time.
>
> Q. So 40-50% of the time that you work for the government you're doing on your own time?
>
> A. That's correct.
>
> . . .
>
> Q. All right. Have you ever told your supervisors that you spend half the time working for the government on your own personal time?
>
> A. Yes.
>
> Q. Who have you told that to?
>
> A. Eric Chilton.
>
> Q. Did you tell that to him on more than one occasion?
>
> A. I'm not certain. But at least one occasion.
>
> Q. And how did he respond to that, ma'am?
>
> A. He told me that I should report my overtime and be paid for it.
>
> Q. Why did you choose not to do that?
>
> A. I guess I wanted to stay ahead of the game, as far as the work was concerned. ***And that was my only way of doing it.*** (Emphasis added)

Judge Zamora's opinion makes it sound as though Fisher only did it because she chose to and that only 40-50% of her "extra" time was on her own personal time.

22.     Of all Virginia investigators (well over 30) employed by the Agency, it can identify only four to say that they did not personally work uncompensated time in order to meet SPD and MOC production quotas.[2]

23.     Prior to being placed on a Performance Improvement Plan (after 22 years of service) Twyman had only one performance appraisal rated as "minimally successful" and all of the rest were "fully successful" or better. T.T. at 163.

24.     Twyman was removed from government service because she did not meet her production quotas for SPD and MOC as well as her ACD quotas. The production quotas significantly affect the ACD quota. *Id.* See, Initial Decision of Administrative Judge Sherry Zamora, pp. 2, 11. Her personal circumstances did not allow her to work "off the clock" in order to bolster her numbers. T.T. at 190-192. If she had been able to work off the clock like the majority of her colleagues, she could have met the mandatory SPD and MOC quotas. *Id.*

25.     One month after her removal from government service, the mandatory SPD and MOC production requirements were abolished. T.T. at 33.

## IV.     Argument

Administrative Judge Zamora correctly stated that the Agency was required to prove by substantial evidence the following: 1) the dismissal action was taken under a performance appraisal system approved by OPM; 2) the Agency had valid performance standards and those standards, along with the critical elements of the employee's position, were communicated to the

---

[2] There was substantial testimony from Karsen, Parker, Garcia and Twyman that Kopman was a "bully" and actively attempted to intimidate employees. See, e.g., T.T. at 113. Garcia and Twyman, at a minimum, would testify that Kopman and their immediate supervisor, Eric Chilton, told them that working off the clock would constitute "falsification" of official records or otherwise constitute a crime. In short, as compelling as the record testimony is, witnesses generally did not feel as free as Fisher to tell the whole story. In any event, nothing in Judge Zamora's opinion appears to rebut, discredit or even doubt testimony that a majority of investigators were compelled to work "off the clock" in order to meet production quotas.

employee; 3) the employee's performance was found to be unacceptable in one or more critical elements of their position; and 4) the Agency afforded the employees a reasonable opportunity to improve their performance.  5 U.S.C. § 4301, et seq.; 5 U.S.C. § 7701(c)(1)(A); 5 C.F.R. § 432.104; see also *Martin v. Federal Aviation Administration*, 795 F.2d 995, 997 (Fed. Cir. 1986).  In this action, Twyman seeks review of the MSPB's decision within the meaning of § 7703(c).  Accordingly, this Court:

> shall review the record and hold unlawful and set aside any Agency action, findings or conclusions found to be –
>
> 1) Arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law;
> 2) Obtained without procedures required by law, rule or regulation having been followed; or
> 3) Unsupported by substantial evidence.

5 U.S.C. § 7703(c); *Tunik v. Merit Systems Protection Board*, 407 F.3d 1326, 1330 (Fed. Cir. 2005).  Twyman asserts her § 7703(c) challenge based on elements (1) and (3), but not element (2).  It is well settled that "[a]n abuse of discretion occurs where the decision is based on an erroneous interpretation of the law, on factual findings that are not supported by substantial evidence, or represents an unreasonable judgment in weighing relevant factors."  *Gose v. United States Postal Service*, 451 F.3d 831, 836 (Fed. Cir. 2006), quoting *Lacavera v. Dudas*, 441 F.3d 1380, 1383 (Fed. Cir. 2006).  Moreover, the interpretation of a statute or regulation is a question of law as is the application of law to fact.  *Kent v. Principi*, 389 F.3d 1380, 1384 (Fed. Cir. 2004).  Finally, the question of whether the termination was "in accordance with law" is itself a question of law, not fact.  This Court must review the critical questions of law and the application of law to fact arising from Judge Zamora's decision *de novo*.  See, e.g., *Gose v. United States Postal Service*, 451 F.3d 831, 836 (Fed. Cir. 2006); *Wallace v. Office of Personnel Management*, 283 F.3d 1360, 1361 (Fed. Cir. 2002).

### A. The Agency's Performance Appraisal System was Invalid.

The burden of proving that the performance appraisal system was valid rests with the Agency. Every single investigator who testified at the administrative trial testified to one or both of the following: 1) they had to personally work uncompensated overtime in order to meet the MOC and SPD production quotas; and/or 2) most investigators were unable to meet MOC or SPD production quotas without working uncompensated overtime. It is clear from the administrative trial record, and consistent with Judge Zamora's factual findings, that a majority of investigators in FISD/SR were required to work "off the clock" in order to meet the MOC and SPD production quotas. Judge Zamora's opinion makes the following finding:

> There is consistent testimony that many investigative agents at FISD complained that they were required to perform job duties on their own personal time outside of the regular 40 hour work week which was uncompensated. All of the Appellants' witnesses as well as Ms. Moore, the Agency's witness, agreed that this was a common complaint that they heard among other agents and at a meeting with Mr. Kopman. However, the evidence is insufficient to find that it was ***not possible*** to comply with the performance standards while working a standard 80 [*sic*, she plainly meant 40] hour work week.

It is clear that she is applying a standard that essentially holds if any one person can meet the production quotas working a 40 hour work week then the performance appraisal system is "in accordance with law." This holding is patently in error. It defies logic to suggest, as Judge Zamora does, that because a minority of investigators could meet the quotas, the performance appraisal system was "valid." This is especially so given that the mandatory SPD and MOC performance targets were abolished one month before Twyman's termination. They were only in existence for a little over a year out of a 22 year career. The Agency's decision to abolish the mandatory nature of the production quotas, while certainly not dispositive by itself, is nevertheless a critical indictment of the system. Of the more than 30 investigators in the

12

FISD/SR region, the Agency can identify only four investigators who claim to have been able to meet the production quotas without working uncompensated overtime. Even these four agreed, however, that it was the "consensus" of their colleagues that a "majority" of investigators were required to work uncompensated overtime if they were to meet the production requirements.

If it is true that a "majority" of investigators were required to work uncompensated overtime in order to meet the MOC and SPD production quotas then, as a matter of law, the use of these metrics violated 5 C.F.R. § 551 and The Fair Labor Standards Act, 29 U.S.C. § 216, et seq. The FLSA prohibits any employer, including the federal government, from "suffering" a non-exempt employee to work uncompensated overtime. The Agency's violations of these standards has prejudiced Twyman in significant ways, including the following:  1) without working off the clock she fell short of mandatory performance goals; 2) working off the clock would have required her to violate the regulations cited above; and 3) the Agency has permitted or suffered to permit Twyman's colleagues to work off the clock so that their production standards could be met. It is clear that Twyman was only terminated after her performance was measured against this unlawful requirement in comparison to peers, the majority of whom worked off the clock in order to meet the requirement. Then, one month before her termination, the requirement was abolished.

Even if the Agency had met its burden of proving by "substantial evidence" that the performance standards were "valid," Twyman could still prevail on Count I if this Court determines that she proved her affirmative defense that the termination decision was arrived at through harmful procedural error.[3] The "decision" at issue is, of course, the Agency's decision to terminate Twyman. It has been plainly demonstrated that a majority of investigators were

---

[3] It is clear that "harmful procedural error" does not relate only to adjudicative procedure, the common definitions of these words apply under guiding principles of statutory construction.

compelled to work personal, uncompensated time in order to meet the SPD and MOC production standards. This common practice violated The Fair Labor Standards Act. As a result, the decision to terminate Twyman was arrived at as the result of the Agency's harmful procedural errors to the prejudice of Twyman. The Defendants' assertion that the Complaint insufficiently sets forth this element is unavailing. These allegations are asserted throughout the Complaint and particularly at paragraphs 22 through 26, though the phrase "harmful procedural error" is not used.[4]

### B.     OPM Never Approved the Performance Appraisal System.

The Agency has the burden of proof of establishing that OPM approved the performance appraisal system at issue in this case. They offer two discordant evidentiary points in their attempt to carry this burden: 1) a letter from the late 1980's that generally approved vague standards of performance under something called a "performance management system" and 2) the testimony of an HR specialist who says that local supervisors have the delegated authority to approve something called a "performance management system." The government's witness cleared up only one ambiguity: she confirmed that the statutory "performance appraisal system" required under 5 U.S.C. § 4301, et seq. and a "performance management system" are two different things. Moreover, she testified as follows in response to a question concerning Kopman's institution of the new performance appraisal system in 2005:

> Q.     Earlier in this trial, Mr. Kopman, who is a GS-15 responsible for the southern region of FISD within OPM, testified that a new performance appraisal system was created when the agents came over from DSS. Do you have any direct knowledge to contradict that statement?

---

[4] The notice pleading standards applied under the Federal Rules of Civil Procedure do not require a direct assertion in the Complaint that "the decision was arrived at through harmful procedural error." In the event the District Court determines that more detailed allegations are required, amendments should be allowed as this case is not set for trial until March of 2010.

   A. No.

Kopman testified that he was told by counsel that OPM had approved the system, but had no idea what the statute required. 5 U.S.C. § 4304 requires that the Office of Personnel Management "shall review each performance appraisal system developed by any Agency under this section and determine whether the performance appraisal system meets the requirements of this subchapter . . ." 5 U.S.C. § 4304(b)(1). Not one document or person can demonstrate that this was done. The only performance appraisal system at issue in this case was created in 2005. In fact, OPM did not even employ this type of employee until 2005. If the requirements of 5 U.S.C. § 4304(b)(1) are to have any meaning the performance appraisal system instituted by Kopman for this brand new class of employee should have been reviewed to "determine whether the performance appraisal system meets the requirements" of 5 U.S.C. § 4301, et seq. There is absolutely no evidence in this record that such a determination has been made.

## V. Conclusion

  For the reasons stated above, the Plaintiff requests that this Court grant her Motion for Partial Summary Judgment under Count I and award her all relief to which she is entitled.

         Respectfully submitted,

         **MARSHA TWYMAN**

     By:   */s/*
       James H. Shoemaker, Jr.
       VSB No. 33148
       Veronica E. Meade Sheppard
       VSB No. 66727
       Patten, Wornom, Hatten & Diamonstein, L.C.
       12350 Jefferson Avenue, Suite 300
       Newport News, Virginia 23602
       Telephone: (757) 223-4580
       Facsimile: (757) 223-4518

jshoemaker@pwhd.com
vsheppard@pwhd.com

## CERTIFICATE OF SERVICE

      I hereby certify that on the 26TH day of October, 2009, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Kent P. Porter
Assistant United States Attorney
Attorney for Federal Defendants
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Telephone: 757-441-6331
Facsimile: 757-441-6689
Kent.Porter@usdoj.gov

                                            */s/*
                                     James H. Shoemaker, Jr., VSB No. 33148
                                     Veronica E. Meade Sheppard, VSB No. 66727
                                     *Counsel for Plaintiff*
                                     Patten, Wornom, Hatten & Diamonstein, L.C.
                                     12350 Jefferson Avenue, Suite 300
                                     Newport News, Virginia 23602
                                     Telephone: (757) 223-4580
                                     Facsimile: (757) 223-4518
                                     jshoemaker@pwhd.com
                                     vsheppard@pwhd.com