IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

FILED
DEC 14
CLERK, U.S. DISTRICT COURT
NORFOLK, VA

MARSHA TWYMAN,

    Plaintiff,

v.

    Civil Action No. 2:08cv519

M. JOHN BERRY, Director,
United States Office of Personnel Management,

and

UNITED STATES OFFICE OF PERSONNEL MANAGEMENT,

    Defendants.

## OPINION & ORDER

This case involves an employment dispute between Plaintiff Marsha Twyman ("Plaintiff") and Defendant United States Office of Personnel Management ("OPM") and its Director, Defendant M. John Berry. Plaintiff was terminated from her employment with OPM on January 31, 2008. She challenged her termination before the Merit System Protection Board (MSPB), but the MSPB affirmed her termination on August 28, 2008. On October 30, 2008, Plaintiff and her co-plaintiff, Pedro Garcia, filed suit in this Court challenging their termination on procedural and substantive grounds ("Count I") and on grounds of racial discrimination ("Count II"). On June 1, 2009, this Court ordered separate proceedings for the two plaintiffs. The Court further ordered that Plaintiff's racial discrimination claims be severed from her non-discrimination claims, based on the differing standards of review governing the two claims.

On October 8, 2009, OPM and Defendant M. John Berry (collectively, "Defendants") filed a Motion to Dismiss Count I for Failure to Prosecute, or in the Alternative, for Summary Judgment on Count I. Plaintiff filed a Response on October 26, 2009. Defendants filed a Reply to Response on October 29, 2009. The Court heard oral argument on the Motion on December 9, 2009. Accordingly, Defendants' motions are ripe for decision. For the reasons set forth herein, Defendants' Motion to Dismiss is **DENIED**. Defendants' Motion for Summary Judgment on Count I is hereby **GRANTED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### 1. Factual Background

OPM's Federal Investigative Services Division (FISD) is a division of OPM that provides investigative services to over 100 different federal agencies. In 2005, OPM/FISD absorbed the functions and workforce of the Department of Defense's Defense Security Service (DSS). (Tr. 8–10).[1] Plaintiff, a DSS employee, was transferred to FSID. (Tr. 187). At around the same time, FISD's regional managers instituted a set of performance standards for the evaluation of FSID investigators. (Tr. 22–25).

These performance standards measured three variables: months of coverage, sources per day, and assigned completion dates. Sources per day (SPD) measured the number of records reviewed or persons interviewed by the FSID investigator in a single day. (Tr. 22). Months of coverage (MOC) was calculated by determining how many months of a clearance candidate's

---

[1] Unless otherwise noted, all references to Transcript or Tr. refer to the official transcript of the MSPB Hearing before Administrative Law Judge Sherry Zamora, conducted on Thursday, June 19, 2004. This transcript was filed under seal on August 14, 2009, and resubmitted as an exhibit to Plaintiff's Memorandum in Opposition to Motion to Dismiss and Motion for Summary Judgment.

2

background the investigator could evaluate in an average hour. (Id.). Thus, if an investigator could review 4 records and 32 months of a clearance candidate's background in a single eight-hour workday, the investigator would achieve a SPD of 4 and a MOC of 4. Assigned completion dates (ACD) were a metric of timeliness, calculated by determining the percentage of cases the investigator has completed by assigned target dates.

Initially, investigators were expected to meet a standard of 4 sources per day, 4 months of coverage per hour, and 85% of assigned completion dates met. (Tr. 30–31; 34). In June of 2006, FSID lowered these standards to 3.5 SPD, 3.5 MOC, and 85% ACD. (Id.). As originally implemented, these standards were mandatory, and applied to FSID investigators nationwide. (Tr. 12; 33–34).

Plaintiff is an African-American female. (Tr. 199). For twenty-one years, Plaintiff was employed as an investigative agent for the federal government. (Tr. 151). During her time at DSS, Plaintiff consistently achieved "fully successful" ratings, but did not achieve any higher ratings or obtain any promotions. (Tr. 213–15). In 2005, Plaintiff was transferred from DSS to FISD. (Tr. 187).

Plaintiff failed to meet the performance metrics set by FSID. (Tr. 188). On November 3, 2006, she was given an annual performance rating of "unacceptable." (Memorandum from Eric Chilton to Marsha Twyman (Aug. 13, 2007) (filed with MSPB record as Tab 1)). She was placed on a 90-day Performance Improvement Plan (PIP), which was later extended to 143 days. (Memorandum from Phillip Kopman to Marsha Twyman (Jan. 22, 2008) (filed with MSPB record as Tab 1)). During that time, Plaintiff's performance metrics were as follows:

3

| Month | MOC (Target: 3.5) | SPD (Target: 3.5) | ACD (Target: 85%) |
|---|---|---|---|
| February 8-28, 2007 | 3.97 | 4.98 | 100% |
| March 2007 | 2.42 | 3.41 | 62.5% |
| April 2007 | 4.10 | 3.70 | 69.2% |
| May 2007 | 2.21 | 1.54 | 90.9% |
| June 2007 | 1.91 | 1.96 | 89.5% |

(Id.).

On August 13, 2007, Plaintiff's supervisor, Eric Chilton, issued a proposal to remove Plaintiff from her employment with OPM. (Id.). Plaintiff was given an opportunity to respond, and provided a written response challenging the agency's decision on a number of grounds. (Id.). The Chief of Field Operations for Plaintiff's Regional Division, Mr. Phillip Kopman, reviewed these challenges and found them to be without merit. (Id.). Plaintiff was terminated from OPM employment on January 22, 2007. (MSPB Initial Decision at 3).

2.   *Administrative Proceedings*

Plaintiff filed an Appeal of Agency Personnel Action or Decision on September 20, 2007. In response to a question asking Plaintiff to "[e]xplain briefly why you think the agency was wrong in taking this action or making this decision," Plaintiff stated in relevant part:

> The Agency made harmful errors in applying required procedures, the Agency action was the result of a prohibited personnel practice and not in accordance with law. Personnel standards were applied in a disparate manner and my termination was wrongful. The alleged reasons for my termination were contrived and pretextual in nature. The Agency subjected me to unlawful discrimination based upon my race and gender. . . .

(Appeal of Agency Personnel Action (filed with MSPB record as Tab 1)).

To prevail against this MSPB appeal, OPM was required to prove by substantial evidence

4

that "(1) [t]he Office of Personnel Management has approved its performance appraisal system; (2) the appellant's performance standards were [valid and] communicated to [her]; (3) the appellant failed to meet one or more critical element of [her] position; and (4) he was given a reasonable opportunity to improve [her] performance." Belcher v. Dep't of the Air Force, 82 M.S.P.R. 230, 232–33 (1999); Diprizio v. Dep't of Transp., 88 M.S.P.R. 73 (2001). Plaintiff conceded that she failed to meet one or more of the critical elements of her position, and that she was given a reasonable opportunity to improve. (MSPB Initial Decision at 5). Her appeal focused on the first two elements of the Belcher standard. (Id.). Plaintiff also raised an affirmative defense, arguing that the agency arrived at its decision after "harmful procedural error."

More specifically, Plaintiff argued that OPM had not approved the performance standards that FSID implemented in 2005. (Id.). She further argued that these standards were not valid, in that they could only be attained by working "off the clock." (Id.). To bolster this latter argument, Plaintiff presented testimony from several of her co-workers to demonstrate "that many investigative agents at FSID complained that they were required to perform job duties on their own personal time outside of the regular 40 hour work week which was uncompensated." (Id. at 19). With regard to harmful procedural error, Plaintiff claimed that the agency required its employees to work uncompensated overtime in violation of the Fair Labor Standards Act.

Administrative Law Judge Zamora presided over Plaintiff's appeal. After hearing testimony from numerous witnesses, Judge Zamora issued a detailed opinion rejecting Plaintiff's appeal. Judge Zamora found "that the agency has established by substantial evidence that its performance appraisal system was approved by OPM." (Id. at 6–10). She further found that "the

5

agency established by substantial evidence that the appellants' performance standards at issue in this appeal are valid." (Id. at 10–23). Finally, Judge Zamora found no harmful procedural error in the agency's decision.

### 3. Proceedings Before this Court

On October 30, 2008, Plaintiff filed an action in this Court seeking judicial review of Judge Zamora's decision. In relevant part, Plaintiff's Complaint repeats her arguments from the administrative proceeding. Plaintiff argues that the performance standards were not OPM-approved and were not valid. (Compl. ¶17).

As discussed above, this Court ordered that Count One of Plaintiff's Complaint be severed from his racial discrimination claims. In the Court's Order of June 1, 2009, the Court stated that in the "Rule 16(b) scheduling order, there shall be two (2) trial dates: first, a trial date on which the issues currently stated in Count One are determined by bench trial, and second, a trial date on which the issues currently stated in Count Two are determined by jury trial." On August 12, 2009, Judge Stillman entered a Rule 16(b) Scheduling Order. Judge Stillman's Scheduling Order did not set a date for a bench trial as to Count One, but rather stated that "plaintiff shall file a motion for summary judgment on or before **September 15, 2009.**" (emphasis in original). Plaintiff filed a belated Motion for Summary Judgment on October 26, 2009.

### 4. Present Motions

On October 8, 2009, Defendants filed a Motion to Dismiss Count One for Failure to Prosecute, or in the Alternative, for Summary Judgment on Count I. Defendants note that Plaintiff failed to file a motion for summary judgment in accordance with Judge Stillman's

Scheduling Order. They argue that Count One should therefore be dismissed for failure to prosecute, pursuant to Federal Rule of Civil Procedure 41(b).

In the alternative, Defendants move for dismissal on the ground that the MSPB's decision was not clearly erroneous. With regard to Plaintiff's argument that the performance standards were not approved by OPM, Defendants note that they presented a letter from OPM's Acting Assistant Director and testimony from an OPM human relations specialist indicating that the standards were approved. In response to the argument that the standards were invalid, the Defendants claim that Defendants' evidence of off-the-clock work was limited and equivocal, and that the vast majority of Plaintiff's co-workers were able to meet at least minimally successful levels of performance.

Plaintiff concedes that he missed the deadline for filing, but contends that this was due to an inadvertent mistake on the part of counsel. Plaintiff argues that Defendants have not been prejudice by this belated filing, and that fairness weighs against dismissal as a sanction. With regard to the motion for summary judgment, Plaintiff argues that the performance standards in place in 2006 were different from the performance standards approved in the letter from OPM's Acting Assistant Director. Plaintiff further claims that the standards were invalid, in that the majority of her co-workers were forced to work uncompensated overtime to meet the standards. Finally, Plaintiff claims that the standards were in violation of the Fair Labor Standards Act (FLSA), and that her termination was therefore the result of a "harmful procedural error."

## II.  DEFENDANTS' MOTION TO DISMISS

There is no dispute that Plaintiff failed to file a motion for summary judgment by the deadline set forth in Judge Stillman's scheduling order. The Court finds, however, that dismissal

is not warranted as a sanction for this error.

The power of a federal court to dismiss an action for failure to prosecute is well-established, derived from a common law analogue in judgments of nonsuit and non prosequitor. See Link v. Wabash R. Co., 370 U.S. 626 (1962) (discussing origin of Rule 41(b)). The Fourth Circuit has instructed trial courts to use restraint in the exercise of their power to dismiss for failure to prosecute, and to consider four factors in doing so: "(1) the plaintiff's degree of personal responsibility; (2) the amount of prejudice caused the defendant; (3) the presence of a drawn out history of deliberately proceeding in a dilatory fashion; and (4) the effectiveness of sanctions less drastic than dismissal." Hillig v. Comm'r of Internal Revenue, 916 F.2d 171, 174 (4th Cir. 1990). The Fourth Circuit has further cautioned that a "dismissal sanction is usually inappropriate when it unjustly penalizes a blameless client for the attorney's behavior." Id.; but see Smink v. Comm'r of Internal Revenue, 85 F.3d 617 (4th Cir. 1996) (table) (dismissing action where party engaged in dilatory tactics both before and after retaining counsel).

Weighing the four factors set forth in Hillig, the Court finds that dismissal is not appropriate as a sanction in this case. Plaintiff claims that the failure to file a timely motion was the result of error on the part of counsel, not an action in bad faith on the part of Plaintiff. Defendants have failed to demonstrate—or indeed, even to allege—any prejudice engendered by Plaintiff's late filings. Nor have Defendants identified any "drawn out history of deliberately proceeding in a dilatory fashion." Hillig, 916 F.2d at 174. In light of these circumstances and the Fourth Circuit's cautionary language in Hillig, the Court hereby **DENIES** Defendants'

Motion to Dismiss Count One of the Complaint.[2]

### III. STANDARD FOR SUMMARY JUDGMENT

Judicial review of MSPB decisions is governed by 5 U.S.C. §7703(c). Young v. West, 149 F.3d 1172, at *5 (4th Cir. 1998) (table). "Judicial review of MSPB decisions is 'very narrow' and is to be based exclusively on the administrative record." Thompson v. U.S. Postal Service, 596 F. Supp. 628, 630 (E.D. Va. 1984) (mem.) (citing Romero v. Dep't of the Army, 708 F.2d 1561, 1563 (10th Cir. 1983) and Doe v. Hampton, 566 F.2d 265, 272 (D.C. Cir. 1977)). A district court "must 'review the record' and set aside any agency findings or conclusions that are 'arbitrary or capricious,' 'obtained without procedures required by law,' or 'unsupported by substantial evidence.'" Id. (quoting 5 U.S.C. §7703(c)(1)–(3)). The burden rests with the appellant to demonstrate arbitrariness or capriciousness, procedural error, or lack of substantial evidence. Rupert v. Geren, 605 F. Supp. 2d 705, 713 (D. Md. 2009) (citing Harris v. Dep't of Vet. Aff., 142 F.3d 1463, 1467 (Fed. Cir. 1998)).

This matter comes before the Court on a Motion for Summary Judgment. Federal Rule of Civil Procedure 56(c) provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Factual disputes which do not raise a "*genuine* issue of *material* fact" are insufficient to defeat a motion for summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986)

---

[2]Defendants argue, in a footnote, that the Court should "preclude plaintiff from offering evidence or argument in response to defendants' motion" as an alternative sanction. The Court finds that summary judgment for Defendants is warranted, even after considering Plaintiff's arguments to the contrary. Therefore, it is not necessary to decide whether Plaintiff's evidence and arguments should be excluded from consideration.

(emphasis in original). The court must "view the evidence in the light most favorable to ... the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 644-45 (4th Cir.2002), while also abiding by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 526 (4th Cir. 2003) (internal quotation marks omitted) (quoting Drewitt v. Pratt, 999 F.2d 774, 778-79 (4th Cir.1993), and citing Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986)).

### IV. OPM APPROVAL OF THE PERFORMANCE STANDARDS

In her decision, Judge Zamora found that "that the agency has established by substantial evidence that its performance appraisal system was approved by OPM." Even viewing the evidence in the light most favorable to Plaintiff, the Court finds substantial evidence in the record to support Judge Zamora's conclusion. It is undisputed that Barbara Fiss, Acting Assistant Director for Performance Management at OPM, wrote a letter in 1988 informing William Irvin, another Assistant Director, that OPM's Performance Management Systems Plans were approved. Plaintiff makes much of the fact that this letter was written over a decade before the implementation of FSID's current performance standards. But the Court sees no basis in law or fact to discount an approval letter simply because the agency has established a long-standing performance appraisal system. See Belcher v. Dep't of Air Force, 82 M.S.R.P 230, 234 (1999) (upholding agency action where approval letter was issued seventeen years before termination).

Plaintiff attempts to dismiss the 1988 letter by pointing to the distinction between a "performance management system" and a "performance appraisal system." The 1988 letter from

Barbara Fiss states that "[t]he purpose of this letter is to approve the Performance Management System (PMS) Plans required under section 430.103(b) of Title 5, Code of Federal Regulations." By contrast, 5 U.S.C. §4302 refers to a "performance appraisal system." Plaintiff argues that the 1988 letter only approved a "performance management system," and that FSID did not implement a "performance appraisal system" with OPM approval.

The Court rejects Plaintiff's argument. Plaintiff takes a portion of the 1988 letter out of context and misleadingly ignores the full text of the letter. The 1988 letter states that "[t]he following plans for the U.S. Office of Personnel Management are approved: Performance appraisal plan for GS, Prevailing Rate, and PMRS employees (required at 5 U.S.C. 4302, 4302a, and 4304." The Court finds "Performance appraisal plan" to be synonymous with "performance appraisal system," particularly since the approval letter explicitly cites 5 U.S.C. §4302.[3] The Court finds substantial evidence, therefore, to support Judge Zamora's findings concerning OPM approval of the performance appraisal system governing Plaintiff.[4]

Although the issue is not clearly presented on appeal, Plaintiff argued before Judge Zamora that OPM did not approve a specific performance appraisal system for her "brand new

---

[3] By setting forth a "performance management plan" which also contained a "performance appraisal plan," OPM was complying with applicable federal regulations. See 5 C.F.R. 430.103(b) (repealed 1996) ("Performance Management Plans shall include each of the following which is applicable to the agency and any additional information requested by OPM: (1) Performance appraisal systems plans required under 5 U.S.C. 4302 and 4312 and subparts B and C of this part.").

[4] The letter from Barbara Fiss, standing alone, is sufficient to meet OPM's burden. See Satlin v. Dep't of the Army, 60 M.S.P.R. 218, 222 (1993). The Court notes, however, that the Defendants also presented testimony from Donna Ifft, an OPM Human Resources Specialist, to demonstrate that OPM had previously approved a "performance management system." (Tr. 229). As discussed in note 3, supra, approval of a "performance management system" would include approval of a "performance appraisal plan."

11

class of employee." This argument runs contrary to a substantial body of precedent holding that an agency may establish an overall performance appraisal system, and then delegate specific performance elements and standards for specific classes of employees. See Lovshin v. Dep't of Navy, 767 F.2d 826, 833 n.6 (Fed. Cir. 1985) (approval pursuant to §4302 "does not involve OPM review of the performance elements and standards established for each position"); Whitney v. Dep't of Treasury, 28 M.S.P.R. 330, 333–34 (1985) ("There is no statutory or regulatory requirement that OPM review the appraisal plan of the agency's subcomponents or review the specific critical elements or performance standards thereof." (citing Evans v. Dep't of Treasury, 24 M.S.P.R. 571 (1984)). In this case, there is substantial evidence that OPM approved an overall five-tier performance appraisal system, and that a FSID management team developed specific critical elements and performance standards to implement this system. This exercise of delegated authority satisfies the requirements of 5 U.S.C. §4302. See Whitney, 28 M.S.P.R. at 333–34.

## V.  VALIDITY OF OPM STANDARDS

The Court finds substantial evidence to support Judge Zamora's finding that FSID's performance standards were valid. Performance standards are valid if they, "to the maximum extent feasible, permit the accurate evaluation of job performance on the basis of objective criteria . . . related to the job in question." 5 U.S.C. §4302(b)(1). "Standards must be reasonable, realistic, attainable, and clearly stated in writing." Walker v. Dep't of the Treasury, 28 M.S.P.R. 227, 229 (1985). "An employee cannot be removed based on a performance standard that requires the employee to achieve an unreasonably high level of performance." Boyd v. Dep't of the Navy, 88 M.S.P.R. 435, 439 (2001).

The uncontroverted evidence demonstrates that the overwhelming majority—98%—of Plaintiff's co-workers were able to meet the production standards. Indeed, approximately one-third of Plaintiff's co-workers performed at an "exceeds or outstanding performance" level. (Tr. 18). It strains credibility to argue, as does Plaintiff, that a majority of FSID's investigators were achieving these metrics solely by working uncompensated overtime. The Court finds that there is substantial evidence to support Judge Zamora's findings that FSID's standards were "reasonable, realistic, [and] attainable . . . ." Walker, 28 M.S.P.R. at 229; see also Thomas v. Dep't of Defense, 95 M.S.P.R. 123, 129 (finding standards to be valid where "nearly all" employees were able to achieve the standards).

If anything, Judge Zamora erred in giving Plaintiff's arguments *too much* credence. Plaintiff did indeed prevent evidence that "many investigative agents at FISD complained that they were required to perform job duties on their own personal time outside of the regular 40 hour work week which was uncompensated." But this testimony specifically related to the performance metrics in place before June 2006. For example, Bill Cupper testified that there was a "widespread complaint" about uncompensated overtime at a "meeting in the early summer of 2006." Similarly, Sandra Fisher testified that at a meeting in "[e]arly summer of 2006," most of her peers claimed to be working on personal time. (Tr. 96–97). Melanie Karsen and Kelly Wright testified along these same lines. (Tr. 110; 125–26). As discussed in Part I, *supra*, it is undisputed that in June of 2006, FSID reduced its SPD/MOC performance metrics by 12.5% in response to employee complaints. Plaintiff produced no evidence or testimony to show that employees complained of uncompensated overtime work *after* FSID reduced its performance metrics. Although Judge Zamora did not discuss this issue, the Court finds that the change in

performance metrics undermines the probative weight of Plaintiff's evidence of employee complaints.

Aside from these employee complaints, Plaintiff produced only limited and equivocal evidence to show that FSID's standards were unattainable or unreasonable. Aside from Plaintiff's co-appellee Pedro Garcia, seven of Plaintiff's co-workers testified about overtime work at the hearing. Bill Cupper testified that he worked unpaid overtime, but only an "hour here and an hour there; on weekends; or three, four hours." (Tr. 78). More importantly, Mr. Cupper testified that he stopped working off the clock in May 2006, shortly before the agency lowered its performance metrics. (Tr. 79). Fred Crack testified that he worked on personal time to meet performance metrics, but admitted that he "didn't do a lot of it." (Tr. 85). Moreover, Mr. Krack testified that he considered any work "beyond your eight hours" to be working off the clock. (Tr. 91). Since Mr. Krack used the agency's flex time policy on occasion, it is not clear that Mr. Krack was working overtime without compensation. Melanie Karsen, Kelly Wright, and Mary Parker all explicitly testified that they never worked on personal time to meet their performance metrics. (Tr. 105; 122; 238). Finally, Deborah Moore testified that she worked off the clock occasionally, but that this uncompensated overtime was limited to making phone calls and printing maps. (Tr. 255).

One witness, Sandra Fisher, testified that she worked a significant amount of unpaid overtime. Ms. Fisher testified that she worked "40 to 50 percent of the time" off the clock. (Tr. 95).[5] It is undisputed, however, that Ms. Fisher earned "exceeds fully successful" on all her

---

[5] Plaintiff makes much of the fact that Judge Zamora quoted Ms. Fisher's testimony about working overtime to "stay ahead of the game" with bracketed alterations. The Court sees no meaningful distinction, however, between Ms. Fisher's original testimony and the quote

performance ratings. (Tr. 98). It is also undisputed that, when asked if she could have met performance metrics without working off the clock, Ms. Fisher responded "I don't know."

In brief, four of these seven witnesses who testified indicated that they did not work uncompensated overtime after June 2006. A fifth witness performed only incidental tasks off the clock, and a sixth witness may have equated "off the clock" with flex time. Only one of the seven witnesses testified to working substantial uncompensated overtime, and even that witness was unable to testify that "off the clock" work was *necessary* to meet the agency's performance metrics. Some of the witnesses testified that other employees were working uncompensated overtime. But none of the witnesses were in a position to observe their co-workers personal work habits, as FSID's investigators generally work independently. (See, e.g. Tr. 99).

Plaintiff also suggests that because the FSID performance metrics were only mandatory for a relatively brief period, their validity is called into doubt. Eric Kopman testified that the agency stopped using SPD/MOC metrics as "hard and fast numbers" because the metrics did not account for geographic disparities. (Tr. 38). If Plaintiff had carried this testimony a step further, and established that the Hampton Roads area is a geographic area where "testimonies per day . . . might not be achievable," the agency's decision to abandon mandatory metrics might have strengthened her case. (Tr. 38). As it is, however, there is nothing to connect the agency's decision to abandon hard and fast metrics with Plaintiff's difficulty in achieving FSID's

---

reproduced in Judge Zamora's opinion. Whether working uncompensated overtime was Ms. Fisher's way of getting ahead of the game, as Judge Zamora wrote, or her *only* way of getting ahead of the game, as Ms. Fisher originally testified, the fundamental meaning of the testimony remains unchanged. Ms. Fisher worked uncompensated overtime to "get ahead of the game." She did not know if she could have met her metrics otherwise. Moreover, even if the alteration did substantially alter Ms. Fisher's testimony, the fact that Judge Zamora bracketed the alteration indicates that Judge Zamora was fully aware of Ms. Fisher's original testimony.

performance standards. To the contrary, the fact that 98% of FSID's regional employees met their performance metrics strongly suggests that the agency was not motivated by any concern about the attainability of performance metrics in the Hampton Roads area.

Considering all of the evidence presented on the record, the Court does not hesitate in finding substantial evidence to support Judge Zamora's findings. "The Board has broad discretion in evaluation of evidence in the record and the weight given to it." Stevenson v. Dep't of Justice, 189 Fed. App'x 973 (Fed. Cir. 2006) (per curiam). Judge Zamora was well within her discretion to find that FSID's performance metrics could be met without working uncompensated overtime. Aside from the appellees' own self-serving testimony, not one witness testified from personal experience that working uncompensated overtime was necessary to meet these performance metrics. The vast majority of Plaintiff's coworkers achieved their performance goals, and a substantial portion of his coworkers earned commendations. Although it is clear that many employees complained about the performance metrics, and some even claimed to work uncompensated overtime, the probative value of this evidence is diluted by the fact that the agency reduced its performance targets and the fact that FSID agents could not observe each other's work habits. Even viewing the evidence in the light most favorable to Plaintiff, the Court finds that Judge Zamora's opinion was supported by substantial evidence.

## VI.   HARMFUL PROCEDURAL ERROR

Plaintiff asserts that her dismissal constitutes harmful procedural error, in violation of 5 U.S.C. §7701(c)(2)(A). More specifically, Plaintiff argues that the agency's policies resulted in widespread unpaid overtime in violation of the Fair Labor Standards Act (FLSA), and thus her termination was arrived at by harmful error.

This argument merits only brief discussion for two reasons. First, Judge Zamora's found that there "is simply insufficient evidence to establish that [sic] by preponderant evidence that the agency violated the FLSA, or any of its implementing regulations . . . ." This finding was supported by substantial evidence. As discussed above, Plaintiff was unable to establish that FSID's employees engaged in widespread off-the-clock work. Although there was testimony to suggest that some employees were working uncompensated overtime, a violation of the FLSA occurs only if an employer has "knowledge, either actual or constructive, of his [employee's] overtime work." Pforr v. Food Lion, 851 F.2d 106, 109 (4th Cir. 1988). There was substantial evidence on the record to show that the agency had a policy against uncompensated overtime, and that supervisors consistently instructed agency employees to report their overtime hours. (See, e.g. Tr. 97). Judge Zamora did not err in finding that the agency was in compliance with the FLSA.

Second, even if this Court were to find that the agency violated the FLSA, such violation would not constitute "harmful procedural error" within the meaning of 5 U.S.C. §7701(c)(2)(A). Harmful procedural error is "error by the agency in the application of its procedures which, in the absence or cure of the error, would have been likely to cause the agency to reach a conclusion different than the one reached." Vincent v. Dep't of Transp., 47 M.S.P.R. 550, 556 (1991); see also 5 C.F.R. §1201.56(c)(3). Plaintiff's FLSA argument is wholly unrelated to the application of agency procedures, but instead relates to the substantive validity of the agency's performance metrics and its policies on uncompensated overtime. Plaintiff cannot write out the word "procedural" and use "harmful procedural error" to challenge any alleged errors in the agency's decision. A violation of the FLSA—if proven—would relate to the validity of the agency's

standards, and would not constitute procedural error.

## VII. CONCLUSION

When Congress enacted the Civil Service Reform Act of 1978, it aimed "to initiate and continue a system that would assure that competent employees would be retained and unsatisfactory employees removed from their positions, while keeping to a minimum the need for protracted administrative and judicial intervention resulting from inadequate standards or appraisals." Wilson v. Dep't of Health & Human Servs., 770 F.2d 1048, 1051 (Fed. Cir. 1985). Congress was well aware that this goal "is simple to express but difficult to achieve: Allow civil servants to be able to be hired and fired more easily, but for the right reasons." S. Rep. No. 95-969, at 4. To this the Court might add that it is not always readily apparent that the reasons or right or that the standards are adequate, and that judicial review is an inevitable consequence of a performance system that gives individual employees the right to challenge their terminations.

A corollary to this point is that even when the standards are adequate and the reasons are correct, a court may still find itself reviewing the agency's decision. The Court finds itself in such a situation today. For whatever reason, Plaintiff was unable to achieve objective performance metrics at the same level as 98% of her co-workers. Plaintiff argued before the MSPB that the deficiency lay not in her performance, but in the standards that FSID implemented. Judge Zamora carefully and exhaustively considered Plaintiff's claims, and rejected them. The Court finds that she did not err in doing so.

For the reasons set forth herein, the Court **GRANTS** Defendants' Motion for Summary Judgment. Count I of Plaintiff's Complaint is hereby **DISMISSED**. The matter shall remain on the docket for further proceedings concerning Count II of Plaintiff's Complaint. The Clerk of

Court is **DIRECTED** to mail a copy of this order to all Counsel of record.

**IT IS SO ORDERED.**

December 14, 2009

Norfolk, Virginia

/s/
Robert G. Doumar
Senior United States District Judge